May it please the Court, my name is Curtis Zahn, I'm here from Educational Credit Management Corporation. I'd like to reserve eight minutes for rebuttal if that's possible. The issue before the Court today is whether it will reaffirm the decision it made eight years ago in Pena or, as Judge Page recognized, adopt a new standard. And actually it's not really a new standard, but rather an old standard with a new name or maybe an old standard without its true name. The Cheeseman can't pay now, can't pay in the future standard that was adopted by the bankruptcy court in Pena has been put forth again by the same bankruptcy judge. And the same reasons that Cheeseman was rejected eight years ago are still true, if not more true today. Since this Court adopted Brunner, five more circuits have adopted it, including the Sixth Circuit, which developed the Cheeseman test. By adopting Brunner, these other courts have recognized the importance of a uniform national standard for undue hardship and protecting financial integrity of the student loan system. As these courts have adopted the Brunner test, not all of them provide a great deal of explanation of why they've done it. However, some courts do. And the most recent court to discuss the Brunner test is the Fourth Circuit in the Fruscher case. And I apologize for the long quote, but I really can't say it any better myself. Quote, nonetheless, the ordinary meaning of undue gives us clear guidance. Undue generally means unwarranted or excessive. Because Congress selected the word undue, the required hardship under Section 523.8 must be more than the usual hardship that accompanies bankruptcy. Inability to pay one's debts by itself cannot be sufficient. Otherwise, all bankruptcy litigants would have undue hardship. The exception would swallow the rule, and Congress's restriction would be meaningless. As a result, and this is, of course, citing this Court's Ruffino decision, the Court states, the existence of the adjective undue indicates that Congress viewed garden-variety hardship as insufficient excuse for a discharge of student loans. The BAP recognizes that principle in their opinion in Nye's. Interestingly enough. And says, the question is, what do we look at? Are we limited to exceptional circumstances, such as medical impairment? And they say, no, no, no, no. That's not exceptional. Any circumstance that the debtor can show that would prevent the debtor from making payment, you know, during this appreciable period of time that the loan is due. Absolutely. And that's exactly. They go through and they lay it out, you know. From what I can gather, there's been some confusion in the bankruptcy courts about how the undue standard under Bruner and under our test, you know, our adoption of Bruner, should be applied. And the BAP attempted to set out some guidelines for the bankruptcy courts. And they did a – I thought they did a fairly good job. Well, a couple comments about that, Your Honor. One of them is that Nye's recognizes it and then ignores it. I mean, they essentially drop back to the can't pay now, can't pay in the future. Their additional circumstance is you can't pay in the future. That is the Cheeseman test, the test that this Court rejected in the Pena case. I don't see that we rejected anything in Pena. And what we said in Pena about Cheeseman is that Cheeseman doesn't represent a new or a different standard. It just used slightly different language, but it applied the Bruner test. That's significant, Your Honor. I think the slightly different language is hugely significant because under the second prong of the Cheeseman test. But it's in applying the Bruner test. The Cheeseman simply applies the Bruner test. Well, a Texas court once said you can put a calico dress on it and call it Florence, but a pig is still a pig. So if you put different words to the test. Bruner test is still the Bruner test. Well, and it's not. The words that are used. Texas and everywhere else. The Cheeseman test, the words used in the Cheeseman test are slightly different, but it's that slight different that's hugely significant. The two biggest things are under the second prong. First, they don't say that additional circumstances exist that are continued throughout a significant portion of their payment period. They simply say that the inability to pay, which is the first prong, is going to continue. They take out that additional circumstance language, and that language is lifted directly from Bruner and has been cited over and over again by all the other courts that have adopted Bruner. Let's say that, yes, we say that there have to be additional circumstances. Mm-hmm. But you have to show the same thing, that his financial condition is going to persist. They say you have to show his financial position is going to persist, and we say there are additional circumstances that show it. Well, that's the thing. Have you a problem with this case? Yeah. I mean, my fundamental problem with Nye's is that the financial situation is the additional circumstance. If that's the case, as the Fruchter Court pointed out, then all debtors in bankruptcy would be entitled to an undue hardship discharge. How about all debtors that are 51 or 52 years old, maxed out in their career, have reached their, you know, this is what they're going to earn for the rest of their life, got 10 years left of earning capacity, basically, and, you know, now they're not going to make any more money. And that's another problem. And one of the things about the undue hardship standard, and I think when you look at it, and I think everyone looks at the perceived harshness of the undue hardship standard, is because they're just looking at that one aspect of the student loan program. And there is – Are we now off additional circumstances? No, no, and this is tying back to the additional circumstances and really where that comes from. Suppose a man were 80 years old. Would that be an additional circumstance? Absolutely not, Your Honor. And this is the key factor here, is that because being 80 years old is an additional circumstance. 80, I should. 80. Yeah, 80. If being 80 is an additional circumstance, that means that every debtor who goes into bankruptcy who's 80 can have their student loans discharged. And that's not what Congress – Do you think that's going to be a big problem? Absolutely, Your Honor. And that's the thing, is when you look at this test and when you look at what it was Well, 80s may be a little bit higher than what I've seen, but you're seeing a lot these days. And if you look at, for example, the Stanley case, Mandala, all these other cases, you're seeing a lot more debtors who are in their 40s, 50s, and 60s. And what they're saying is, I can't pay back my student loans. And that's not unexpected. I mean, bankruptcy is for the honest but unfortunate debtor. It's not unfortunate if you create your own situation. The person who is walking down the street and falls into a pothole, that's unfortunate. The person who spends years digging a hole and then jumps into it, that's not an unfortunate circumstance. Who digs a hole and jumps into it? Borrowers. By taking out loans. If you are a 37-year-old debtor who takes out a bunch of student loans, maybe to get a master's degree in social work, and then you're done with your degree and you're late 40s, and then you don't pay on your loans for 9 or 10 years. So the loan balance that was less than $30,000 is now $85,000. And also, you're now 51 years old. That debtor entirely created their own circumstances. And one of the – No. Go ahead. No, I'm just going to make a comment. No, no. My only comment was, you know, take your position and suggest that, you know, it should be the rare instance that these student loan debts are ever discharged in bankruptcy. And if Congress knows what they're doing, Congress could have said these student loans are just not subject to dischargeability, period. Or they could have put down very definitive criteria. And they know how to do this because we recently had a case where they said that you could garnish Social Security benefits to pay student loans. Absolutely. I mean, they know what they're doing. And here they said undue hardship. And they left it to the courts to define. And it's pretty clear under Bruner that there is flexibility in that standard. Your Honor, I would slightly disagree with you. I think that you did recognize it. I don't think there's really any flexibility in it. And what you pointed out is it is the rare circumstance. And that is, in fact, exactly what the Fourth Circuit recognized when it stated the heart of the Bruner test is the second prong. It clearly reflects the congressional imperative that the debtor's hardship must be more than the normal hardship that accompanies any bankruptcy. And then it goes on to state. But, Mr. Zahn, doesn't that really focus on the hopelessness of the situation, the debtor's unlikeliness of ever being in a position to repay the debt? Well, it's not just the hopelessness, but it's also the reason for the hopelessness. If you look at Bruner, one of the key elements that they took out from the congressional history on this is that the debtor's inability to pay must be for circumstances beyond their control. Well, what do we do with Ms. Nyes? I mean, she's basically at the top of her profession as a drafter in a relatively rural county in Northern California where $40,000 a year is, according to the bankruptcy judge, is good money. But she's never going to make a whole lot more than what Humboldt State can afford to pay draftspeople. Absolutely. And that's the one problem, I think, with just looking at the undue hardship in isolation. And I think you have to look at the entire program. The student loan program really can't be viewed as just a loan program. It's really more of a social program. And when you look at the terms that Congress created for this program, it's clearly meant to promote education. A debtor of any age can get any education that they choose. And despite the fact that that's unsecured and there's no respect for creditworthiness, in fact, student loans are generally given to the, you know, to people who have a need. So really the worst credit risk, they can get student loans at interest rates that are better than mortgage rates. They also control the terms of repayment. They can determine by deferments and forbearances when they're going to start. That's responsive to my question. And I was getting to that, Your Honor, is because — Let's get there. Sorry. If you look at all the programs, at the end of the day, this litigation is not about repayment. This litigation is about dischargeability. Other laws dictate what she will have to pay. If the court reaffirms the Bruner test they adopted in Pena and have since reaffirmed in numerous other cases, Ms. Nyes won't have to change anything about her life. Well, that's not what the BAP said. The BAP said that it may be that she's only eligible for a partial discharge. And this is the point, is that it's beyond the debtor's control. The reason why Congress made this standard so incredibly high was that they knew all the other aspects of the program allowed a student to make their choices and to kind of dictate the terms of repayment, how long they're going to pay to pay based on what they owe or now to based on percentage of their income. In Nyes' case, if this court reaffirms the bankruptcy court's determination of nondischargeability, Nyes isn't – if she doesn't want to voluntarily pay, she doesn't have to. I mean, nothing's going to force her to. This litigation is not about repayment. What will happen is what started this litigation. Pursuant to the Higher Education Act, her wages will be administratively garnished at 10 percent of her disposable pay. So at the end of the day, the issue for this Court is, is it unfair or unjust to make her pay 10 percent of her disposable pay? I don't think it is, because her situation – in fact, I think that's overly generous, considering that she's in the situation that she is today because of all of her voluntary choices. When asked, have you looked for another job? So she's supposed to move to San Francisco or to Los Angeles? No. And that's the thing, Your Honor. No one's saying that she has to move to San Francisco. Just to leave her field of training? She doesn't have to – she doesn't do anything that she doesn't want to do. But the fact is, as so many courts have recognized, like the cellist in Gerhardt or the minister in Euler, you don't have to change anything about your lifestyle, but you can't use the choices that you make in your lifestyle to justify a discharge of your student loans. In Nyes' case, she should be required to pay 10 percent of her disposable pay for her remaining working life. Then when she retires, whenever she chooses to, she can go into the William B. Ford Income Contingent Repayment Plan and, again, pay – Is that the one where they quoted her $14,000 in a regulation fee? You know, Your Honor, and the fact of the matter is that her statements about that program are so grossly inaccurate that the court need only look at the statute. The William B. Ford program is defined by statute and regulation. Her statements are absolutely preponderous. Either she called the most incompetent customer service person that ever worked for William B. Ford, or she was – I couldn't even say. It was just completely mistaken. But there is no origination fee. When you consolidate your student loans, in fact, your student loan balance goes down because on a defaulted borrower, the collection costs are mandated by federal regulations. When you consolidate, those collection costs are capped at a lower percentage. So, in fact, when you consolidate your loans, your overall balance goes down. So her statements about the program are just – and maybe some of the payments might have been for a standard repayment plan, but, again, very few debtors, especially those who acquire large amounts of debt, can afford to pay back their student loans in 10 years. That's why they have a consolidation program. Where does the BAP in the standard that it tries to set here or the guidance that it tries to give to the bankruptcy courts, where does it – from your perspective, does it really go wrong? Where is the language that shows that it's departing erroneously from Bruner? Well, one of the big things is that the Court says that you don't have to be anything more than the ordinary debtor in bankruptcy, and, in fact, that's exactly what this Court said the opposite of in Ruffino. And the Court, again, when talking about the additional circumstances, made the debt itself. I mean, the circumstances they talk about, illness, unexpected – you know, large number of dependents, all those things are what other courts have recognized as additional circumstances. Nye's has none of those. Nye's hardship is purely based on the debt. And if the debt is a hardship, then every debt – like, as many courts have recognized, every debtor in bankruptcy will have an undue hardship. Well, why do you keep saying every debtor is going to have an undue hardship? You have a debtor whose current income is $1,000 a month. No reason to think – you know, it's bad times. There's no market for what he can do at the moment. But why do you say that for the rest of his life it's going to be clear he's not going to be able to earn more? Why is everybody who's earning X committed to life to earning half X? Well, and hopefully they'll make more. But that's the thing, is if the debt itself – No, he won't. So that's the difference. He's not everybody, or she's not everybody. But you say if we say that someone who is not going to make more for the rest of her life, if we say that's the additional circumstance, you say it'll apply to everybody. And I don't understand your reason. Well, in this case, I think the focus of the additional circumstances prong is not just whether or not you're going to ever pay in the future. That's part of it. And obviously, if it's clear that you might be able to pay, then you're not going to meet the standard. But the heart of it is really just beyond their reasonable control. Otherwise, any debtor – and most debtors in bankruptcy obviously are there because they've made several bad choices. And for the most part, the code doesn't really question the bad choices they've made. But it's clear that Congress, when it comes to student loans, severely questions the choices they've made, and they cannot get into their situation because of their own free choice. And just to – as I see my time's running up, to finish off, if this Court decides to adopt – Oh, you said you wanted eight minutes. You're down to – Yeah, I'm far beyond that. And so if you'd like, I could just – well, I'd like to make this statement because I think it's important. If this Court decides to adopt a lower standard, and there's no doubt that this is a lower standard because all it requires is an inability to pay and no question of why that is, there's going to be some profound implications. First, the undue hardship standard is meant to protect the financial integrity of the student loan system. Obviously, any weakening of that standard weakens the integrity of the system. Further, as the Fourth Circuit noted in Frewsher, applying a looser standard, courts would inevitably reach inconsistent results across bankruptcy cases. Some loan recipients would obtain discharge, while others in similar circumstances would unfairly remain obligated. A looser standard would also be unfair to the vast majority of loan recipients who do not attempt to discharge their loans and meet their obligations even with much self-sacrifice. And this echoes what Judge Lucero on the Tenth Circuit said when he said, quote, it is important that the student loan program operate free of the cynicism that would infest the system if a disparate standard for discharge of loans were to develop, leaving some students enduring the hardship of making loan payments while others are freed of their commitment on a floating standard. And finally, I think to do that would also be at odds with the very purpose of the bankruptcy laws. Recently, the Supreme Court in Central Virginia Community College v. Katz discussed the history of bankruptcy law, and it's actually kind of a fascinating discussion of bankruptcy law and how far it goes back. But one of the things they pointed out was the purpose of national bankruptcy law was to avoid the difficulties and injustice of a patchwork of differing state laws. According to their decision in Gibson, the Court stated, bankruptcy laws must be uniform throughout the United States. Adopting a new lower standard for undue hardship will create the difficulties and injustices that the bankruptcy law was meant to avoid. Thank you. Thank you, counsel. Good morning, Your Honors. The place of court, Christopher Metzger for Lorna K. Nice, the debtor and appellee. Your Honor, the BAP opinion in this case does not adopt a lower standard. It does not change the law. The only – what the BAP opinion does is it follows exactly the in re pena test, but does a very good job of explaining how to apply that test with respect to the additional circumstances element. And it in no way is a lower standard. It is in no way a departure from prior law. The claim by appellant that the trial judge in Pena, who was on the BAP panel in Nice, somehow wants to rewrite the law to adopt a Chessman standard, which had been rejected in Pena, is actually contradicted by Pena. In Pena, at page 1112, the Ninth Circuit, in upholding the bankruptcy court's opinion or bankruptcy court's judgment, stated, quote, it does not appear that the Sixth Circuit in Chessman was proclaiming a test distinct from Bruner. So the – what appellant, I believe, is trying to do is trying to mischaracterize Nice as being new law, as being a change in law, when, in fact, it's not. Where the change in law occurred in this case was at the bankruptcy court trial level. The bankruptcy court expressly found that the debtor was unable to presently pay the student loan debt, and then the court stated that that inability, quote, will almost certainly persist for the foreseeable future, and that was in its written memorandum. In its oral findings, the court had stated that the inability to pay was, quote, likely to persist for the rest of the debtor's employable life. And the findings of the bankruptcy judge were a recognition that there were additional circumstances showing that not only could the debtor not pay now, but that she couldn't pay for a significant portion of the repayment period. Where the bankruptcy court judge erred, and this is what the BAP panel found, and this is just being consistent with the Paney cases, where the bankruptcy court erred was saying that the focus of the additional circumstance test should not be on whether the debt will ever be repaid, but rather the focus should be on whether the debtor is deserving of a discharge. And in terms of deciding whether the debtor is deserving of a discharge, the bankruptcy court wanted to focus on whether the debtor had a medical problem, had a psychiatric disability, or whether the debtor somehow was more deserving of a discharge than an ordinary person in debt, and that is not the standard of Paney. The focus, as the BAP panel held in Nice, the focus of the Paney test is on whether the inability to pay is likely to persist for the foreseeable future or for the significant portion of the repayment period. The claim by appellant that just that when you say that a court finds you can't pay now, but they also find that you can't pay in the future, that that's essentially makes all debtors eligible for discharge is just not true. One can easily imagine hypotheticals. In fact, there's a myriad of cases where courts have held that there is no ability to pay the debt now, but that the debtor could not prove that that circumstance was likely to continue. One hypothetical that I suggested at the BAP oral argument was if, let's say the debtor is a doctor, works for a hospital, the hospital has to be torn down and reconstructed, the doctor is laid off for six months while the hospital is being reconstructed, and the doctor could show that because she's laid off or he is laid off, she can't repay the debt now, but that doesn't mean that in six months she wouldn't be able to repay the debt. So there are two distinct elements. To say that you can't pay the debt now is not the same thing as saying that there's evidence that shows the debt won't be, can't be paid in the foreseeable future. In this case, the debtor, Lorna Nice, presented numerous additional circumstances that show that she could not repay the debt in the foreseeable future. The bankruptcy court's finding that her inability to pay would continue for this foreseeable future or for the rest of the debtor's employable life was in fact correct. The bankruptcy court just didn't like the test. The bankruptcy court expressed throughout the trial and even in its written opinion and in prior opinions by the same bankruptcy court, the In re Patterson, has expressed disagreement with the way Bruner is applied. But I would submit, Your Honor, Your Honors, that Congress is aware of how Bruner has been applied. It's been on the books for many, many years, and Congress has amended the bankruptcy laws numerous times throughout that period and has chosen not to change the student loan test. They've left it alone. They did make one change where they dropped a provision that gave an automatic discharge if the debt was more than seven years old. That's been taken out. But they haven't changed any of the rest of the test. And they know full well, as Your Honors have pointed out, they know full well how to amend the bankruptcy code to make a debt non-dischargeable in all cases. They recently changed 523A15 as part of the new amendments to make debt that previously was subject to a weighing of the hardships under A15, property debt in a marital case. That debt is now automatically non-dischargeable. So they know full well how to make a debt non-dischargeable in all cases, and they do that when they feel it's appropriate. In the case of student loans, they've chosen not to change the law. So it's not appropriate for the bankruptcy court judge to change the law on his own, as he did in this case. The Nice opinion simply held that the focus of the test needs to be on exactly what Pena says, whether there are additional circumstances that show the inability to pay is likely to persist for the foreseeable future. In this case, Nice, Lorna Nice, presented numerous additional circumstances. She – and this is a big distinction with the cases where discharges have been denied. She has maximized her income rather than chosen not to maximize it. She got her degree, worked hard to get the drafting position, and then has moved up. And so she's maximized her income that the judge ruled that she was incapable of earning more. That was his word, incapable. So she has maximized her income. It's not like she's – a lot of the debtors, like in the Borain case, the debtor in Borain chooses to run a dance studio, even though she has a master's degree and could make more. The case – the Euler case, the debtor chooses to be a pastor, making less than $10,000 a year of a small church, although he has the ability to make much more than that. And I think in most of the cases cited by the appellant where the courts have held that the second additional circumstances test weren't made, the debtor hadn't maximized her income. Here, Lorna Nice has maximized her income. That's an additional circumstance. She is 51 years old. She drives 54 miles round trip to work. She has a very stressful job, which limits her ability to work a second job. She's lived in Humboldt County for 20 years, has family there, which makes it unreasonable for her to try to move. As the panel pointed out, even if she were to try to move, she's already working for the state university. She'd probably only succeed in increasing her expenses. Her housing expense is quite low. So if anything, she would harm her ability to pay. She's in effect showing good faith by telling the court, I think I have the ability to pay back some of this debt, and she stated she was willing to accept a partial discharge. She stated she could afford to pay some amount of money, and she was willing to do that. But she still has met the criteria for undue hardship, because she can't afford to repay the whole amount. What the appellant cites, that if she's denied a discharge entirely, there would only be a 10 percent administrative guardsman, I don't believe that evidence is in the record. The testimony that she – that was in the record was that she was told her payment was increasing to 917 a month. She made numerous attempts to negotiate a payment plan and then file for bankruptcy. And in the bankruptcy court, through a partial discharge, an appropriate payment level could be set. The NICE opinion doesn't say that she's per se going to get a discharge. The Ninth Circuit said that it's – I'm sorry, the BAP opinion did not grant NICE per se a discharge. It simply said we want the bankruptcy court to look at this under the correct standard and perhaps only give her a partial discharge. So – and I think that that's really what the bankruptcy court's job is, is to determine if she can afford to pay some of it, how much it is. I think the bankruptcy court, if you look at all the places in the record where it expressed frustration with the Bruner case, it just, quite frankly, appeared to me that it would prefer not to have to deal with these matters. But the BAP opinion is correct that this is the law. Congress is the only one who can change this law, and the bankruptcy courts have to deal with it, whether they – even if it's messy or, you know, law that the judge in this case doesn't agree with. So I would submit, Your Honor, that the BAP opinion in NICE, Your Honors, does not in any way change the law. It just does an extremely good job of clarifying how the additional circumstance test should be applied. Thank you, counsel. Thank you. Okay. You've got about a minute. We'll give you two, if you'd like. Thank you for being so generous, Your Honor. The first thing I want to point out is that Bruner is fine. There's nothing wrong with Bruner. And I think you're right. The Congress could have changed it, but they don't need to. If you look at – if you read the Bruner case and you read all the circuit-level decisions that discuss Bruner, Congress is fine. It's made it clear. The courts have recognized how high this bar is, and courts have said it is the rare circumstance, the dire circumstance where a debtor will get the discharge. The – one need only look over all of the cases on undue hardship discharge. That's what we said in Bruner, though. Excuse me, Your Honor? In Pena. Or in Pena, I'm sorry. That's not what we said in Pena. It was dire or rare. That's not what you said, but you adopted the Bruner test. And the Bruner test – I know, but you just told us all the cases said that it had to be dire or rare, and I told you that the Ninth Circuit case, the main one, doesn't say that at all. It hasn't said that, but if you – That's what you're advocating for. That's what courts have said. Well, of course, it's not what he represented. That's what – that's what circuit courts have said these – this standard means. I mean, if you want to sum it up in a nutshell, that's what it means. And it would be tough to find a decision with facts like the debtors where a debtor got the discharge. And there are no circuit-level decisions that are as good as hers. In fact, most of the circuit-level decisions have far more compelling facts, and the Court's denied a discharge. But that didn't say she was entitled to a full discharge. It said that the trial court's got to go back and look at this and apply the standard correctly, and maybe she'll get a partial discharge. And, Your Honor, she shouldn't get any discharge at all because her situation was not beyond her control. The purpose of the undue hardship exception – I don't think she can control here. She can't – she can't find a higher-paying drafting job. I suppose she could do – I'm not sure she could sell her little house in Fortuna with the existing problems with the foundation and the wind blowing through it. I mean, it kind of reminds me of the Arkansas fiddler. You know, the roof doesn't leak when it doesn't rain. She decided when she was going to go to school. She decided what she would go to school for. She decided not to make any payments on her loans for nine years. It's not understandable. I mean, any debtor, if I – What's going to happen? I mean, let's assume you're right. What happens to her? What does she do? She obviously doesn't have the money to pay it off. Are you going to seize the house, probably? Absolutely not, Your Honor. And that's what I was talking about. Really, the focus of this – What happens? What happens is, assuming she won't pay on her loans like she hasn't done in the past and 10 percent of her disposal pay will be garnished. That's it. That's what happens. That is, again, the repayment terms on student loans are generous. Eventually, you could garnish her Social Security benefits. You could garnish – you could put a lien on her house. Well, and that's the thing – She sells the house. The house – the excess money goes to pay it off. Actually, no, Your Honor. It's just not the 10 percent. Well, actually, no, Your Honor. If you look at the regulations, specifically 34 CFR 682.410b-6 highlights the due diligence requirements. And no longer do guarantee agencies go out and get liens on houses. In fact, it limits the ability to go out and use traditional collection mechanisms only if the wages can't be garnished. So a guarantor, if they're garnishing the wages of a borrower, would never go out – Why are you better off getting 10 percent of her wages than having her go back and have the loan reduced to a manageable amount, which is probably going to be more than 10 percent? Because the fact of the matter is there's really no certainty about what she can pay. Obviously, any court's always speculating. The one thing, though, is for certain, is that undue hardship is meant to keep open the possibility of payment and payment's determined by the Higher Education Act. If you discharge any portion of that debt, then that will never be able to be collected. And the fact is if you do a partial discharge and reduce it down to $40,000, who's to say she'll pay that? She won't pay that either. And again, she'll be garnished at 10 percent of her wages. So you're really arguing 10 percent of the full amount versus 10 percent of some lesser amount? Exactly. I mean, she's not going to – she didn't pay it when it was 30. She's not paying 85. The fact is I doubt she'll ever pay it. And so at the end of the day, whether you reduce her balance down to 10 or 20, she's still not going to pay it. She'll still be garnished at 10 percent. That's the end result. The fact is student loans, unlike people's cars – Some people will pay it. Maybe they ought to just wipe it out next time. My understanding is that when actually Congress passed the William B. Ford program in 1994, they considered eliminating the undue hardship standard. But again, I think if you look at the program as a whole, instead of looking at this harsh result, it's really, again, saying we give you all these really beneficial things, repayment terms, but we're still going to allow you because maybe there's some odd circumstance that all these other things don't fit into. So they still left it open. So rather than being harsh, it's, again, showing the generosity of the student loan program. Thank you, Your Honors. Thank you, counsel. Case just argued will be submitted. The Court will take a 10-minute recess.
judges: Reinhardt, Paez, Tallman